## R. J. Stephens v. The State.

*No. 28. Decided December 17.*

1. **Special Venire—Practice—Postponement.**—On a trial for murder, when the list of the special veniremen, consisting of a hundred names, was called, and it was ascertained that three were absent, defendant moved to postpone the trial; which motion was refused by the court, and instead ordered the issuance of process instanter for the absentees. *Held*, correct. Hudson's case, 28 Texas Ct. App., 338; Habel's case, Id.. 589.

2. **Same.**—When a jury was being selected from the special venire, and it was ascertained that two of the list were absent as jurymen in another case, defendant asked a postponement of the case until the other case had been decided, which motion was refused. *Held*, there was no error, and especially so inasmuch as these two absent jurymen, before the jury was selected and empanelled, were discharged from the jury upon which they were serving, appeared and were placed on the panel, whereupon one was challenged by the State and the other by the defendant.

3. **Same.**—After the special venire had been exhausted, the court stated to counsel that he would delay the further organization of the jury until the three absent veniremen for whom process had issued could be brought in; whereupon defendant's counsel stated that they were willing to proceed with talesmen, without waiving any previous right under their motion to postpone. *Held*, no error prejudicial to defendant is shown.

4. **Charge of Court—Manslaughter—Requested Instructions.—** See the opinion for a charge upon the issue of manslaughter as applicable to the facts proven, *held*, sufficient, especially in the absence of special instructions requested on that subject.

5. **Same—Requested Instructions—Practice.—** Requested instructions, however correct, are not required to be given by the court unless they are written and presented by the party desiring them.

6. **Evidence.**—See evidence stated in the opinion of the court which was held amply sufficient to warrant the jury in disregarding defendant's version of the homicide, and amply sufficient to support a verdict and judgment for murder in the first degree with the death penalty assessed. Hurt, Presiding Judge, dissenting.

Appeal from the District Court of Parker. Tried below before Hon. J. W. Patterson.

Appellant was indicted for the murder of one George Steelman, by shooting him with a pistol, in Parker County, on the 23d day of October, 1891. His trial resulted in a conviction for murder in the first degree, with the punishment assessed at death.

The facts of the homicide are so concisely and lucidly given in the opinion of the court, that it is unnecessary to give any further or additional statement.

The questions raised on the trial in the court below, and insisted on as error on appeal, are fully shown by briefs of counsel and the opinion of the court.

*A. H. Culwell* and *I. N. Roach*, for appellant.—The court erred in compelling the defendant to go into the formation of the jury when all of the veniremen who had been served were not present, nor accounted for, and in overruling defendant's motion asking for postponement of the organization of said jury, as the names of each of said absent veniremen were reached and called.

In the organization of the jury in capital felonies, the law requires that the names shall be called on the venire facias in the order in which they appear upon the copy that is served upon the defendant, and it is the right of the defendant to have them tested in that order, and the court has no right to force the defendant into the organization of said jury until all of the jurymen whose names appear upon his copy are present, or their absence is satisfactorily accounted for, and it is the right of the defendant to have them tested as their names are severally reached and called.     Code Crim. Proc., art. 640; Cahn v. The State, 27 Texas Ct. App., 709; Thuston v. The State, 18 Texas Ct. App., 26; Osborne v. The State, 23 Texas Ct. App., 431; Bates v. The State, 19 Texas, 123; Wasson v. The State, 3 Texas Ct. App., 474.

When two parties engage in a mutual combat, and one of them quits the fight and retreats, and while so retreating the other fires upon and kills him under the immediate influence of sudden passion, the killing can not be of a higher grade than manslaughter.

The defendant in a criminal case is entitled to a charge upon every issue or defense presented by the evidence, and to have the same determined by the jury, without being forestalled by the charge of the court.

The defendant testified that the deceased grabbed him, and forced him down, and that after he fired the second shot, deceased turned and ran, when he fired again and deceased fell, and that he was very much excited.   Drake v. The State, 29 Texas Ct. App., 267; Jones v. The State, 29 Texas Ct. App., 338; Richarte v. The State, 5 Texas Ct. App., 359; Farrer v. The State, 42 Texas, 266; Walker v. The State, 14 Texas Ct. App., 610; West v. The State, 2 Texas Ct. App., 460; Hobbs v. The State, 16 Texas Ct. App., 517; Bracken v. The State, 29 Texas Ct. App., 362; Howard v. The State, 23 Texas Ct. App., 265; Murray v. The State, 1 Texas Ct. App., 418; White v. the State, 18 Texas Ct. App., 57; Reynolds v. The State, 8 Texas Ct. App., 412.

*R. H. Harrison*, Assistant Attorney-General, for the State.

SIMKINS, Judge.—Appellant was convicted of the murder of George Steelman, and his punishment assessed at death, from which judgment he appeals to this court.

1. Appellant complains that he was forced to proceed in the organization of the jury, notwithstanding three out of the special venire of 100

persons failed to appear, and the court overruled his motion to postpone the trial. The court ordered process to issue instanter for the absentees, but refused to delay the trial, and in this the court did not err. Habel's case, 28 Texas Ct. App., 589; Hudson's case, 28 Texas Ct. App., 338.

2. The appellant further complains that the court erred in refusing to have two of the venire, then absent as jurymen in another case, called in and qualified, or to have the trial postponed until that case was decided. It was shown that before the jury was made up the jurymen were discharged from the case which they were considering, and were placed on the panel; but one was challenged by the State and the other by the defendant, and no error is shown.

3. The appellant also complains that when he reached the names of the absent jurors the defendant asked the court to postpone the trial until the absent jurors were returned, and the court overruled the motion. But it is also shown, that after the special venire was exhausted, the court stated to counsel he would then delay the organization until the absent veniremen were brought in, and thereupon defendant's counsel stated they were willing to proceed with talesmen, but did not waive their objection to the court refusing to postpone the organization of the jury originally. Held that no error prejudicial to defendant's rights is shown.

4. Appellant complains again of the failure of the court to charge upon a phase of the testimony arising from defendant's statement of the manner in which the homicide occurred. Upon the trial defendant testified for himself. He stated that while on his way from the house of deceased to the house of deceased's father to get one Bush, who resided there, to help him do some work, he met deceased on his way home from his father's. It was dark. He asked deceased if Henry Bush was at his father's house, and deceased answered, "Yes." That just then they were alongside of each other; and deceased asked if he, defendant, had been at his house. Defendant replied he had. That deceased then charged him with being intimate with his wife, and caught hold of him. That a struggle ensued, in which defendant was forced to his knees. That, believing that deceased was armed and about to kill him, or do him some great injury, he drew his pistol and fired behind him once, and then shot twice with the pistol over his left shoulder at deceased, who was behind and over him. That deceased screamed, and released him and ran, and he shot at him as he ran, but does not know whether he hit him. That deceased fell at some distance, and he went to him, and fired at him as he lay on the ground, dead. He then went home and ate a hearty supper. There was blood on defendant's coat, on the sleeves and breast, and some blood on the center of the back. One witness says he was satisfied from the signs on the ground the parties had a scuffle. Deceased was shot in the throat and side of the neck, and in the back. He was unarmed, and in his shirt-sleeves. The face was powder-burned, and the shirt collar burned.

The court charged the jury upon defendant's statement as follows: "If you find deceased, before or at the time of the killing, accused defendant of being too intimate with his wife, or had made an attack upon defendant, and had struck or thrown defendant to the ground, and you believe from said facts and circumstances, or from them and other facts and circumstances, that the defendant was put into a sudden passion of anger, rage, and sudden resentment or terror, and that the mind of the defendant was thereby rendered incapable of cool reflection, and that in such condition the defendant shot and killed said Steelman, and if you believe the killing was not justified by law, you will find the defendant guilty of manslaughter."

Again, on self-defense, the court substantially charged, that "If defendant shot and killed deceased, and prior to the shooting the deceased made an attack on defendant, and the attack was such as to put defendant in danger of death or serious bodily injury, or it reasonably appeared so to the defendant, and defendant, to protect himself from the attack, shot and killed deceased, you will find defendant not guilty. Or, if you believe before such killing deceased made a violent attack on defendant, who, to protect himself, killed deceased, you will find defendant not guilty; and it is not necessary the danger should be real, if it reasonably appeared to defendant he was in danger, looking at the matter from the defendant's standpoint." The court also charged on imperfect self-defense, and upon threats by deceased, and upon the right of defendant to arm himself against threatened attack. The jury found the defendant guilty of murder in the first degree, and fixed his punishment at death.

Now, the proposition is, that we should reverse this judgment, because the court failed to charge the jury, that if, after making the attack on defendant, the deceased abandoned the conflict and ran away, and the defendant fired and killed him under the influence of the passion aroused by the attack, he would not be guilty of murder upon express malice. We can not agree to this proposition. The jury repudiated the statement of defendant that deceased had made any attack upon him whatever, and therefore there could have been no "abandonment" of the difficulty. Again, if defendant be correct that he fired three times while on his knees, held down by deceased, and once at his body after deceased had fallen, then he did not fire at deceased while running, because all the witnesses who heard the shooting testify to four shots only, and defendant says there were two barrels of his revolver not fired. One of the bullets was picked up under deceased's body, flattened. Again, defendant stated that he fired at deceased when he started to run. He did not see him fall. He did not run after him, but walked from where he first met him to where he fell dead, and shot him as he lay on the ground, dead, face downward. Deceased was found sixty yards from where his hat lay.

But the charge of the court was sufficient. It distinctly sets forth the

law, and certainly as favorably as could be asked. "If," says the court, "the killing was under sudden passion or other emotions of the mind that rendered the mind incapable of cool reflection, it would only be manslaughter," whether caused by the charge of improper intimacy with the wife of deceased, or by a sudden attack, or by such facts and other facts and circumstances; and if the killing was perpetrated in fear of death or bodily injury, it was justifiable. Charge of manslaughter, when sufficient, will be sustained in the absence of requested written instructions amplifying the particular objected to. Surrell's case, 29 Texas Ct. App., 321; Drake's case, 29 Texas Ct. App., 274. Requested instructions, even when correct, are not required to be given unless written and presented by the party requesting them. Code Crim. Proc., art. 679.

Seldom, perhaps, has a case been presented to this court more marked with evidence of express malice than this. For more than a year defendant had been on intimate terms with deceased's wife, and had several times urged her to abandon deceased, and go with him to California; in fact, had done so on the day of the homicide, and she declined, because it would prevent her getting a divorce. Deceased's wife did the sewing for defendant, and occasionally shaved him and rode with him to town. He was often seen going to the house in deceased's absence. Deceased knew of the intimacy, and was troubled about it, but never said a word about defendant to any one. His wife stated on the stand that she did not care for her husband; that he was unkind to her children by a former husband. A short time before the killing, defendant borrowed a gun, which he kept hid in the woods for two days, trying to get a chance to shoot deceased. About ten days prior to the homicide he borrowed a pistol, and returned it to the owner, stating that it was too small. On the day of the homicide he borrowed $5 from deceased's wife, with which he bought the revolver used in killing her husband. It was a large 44-caliber. That evening about 6 o'clock he went with it to deceased's house, and asked when he would be home, and stated he would as soon kill deceased as a dog. His wife stated that he was at his father's (who lived 400 yards distant), and would not be home until after supper, as he ate supper there; that he would come home between 7 and 8 o'clock.

There is no evidence how he occupied the intervening time, but defendant claims to have gone near to his own house, a mile distant, at dark, and worked on a fence till 7, when, without going to his house, or eating supper, he started to the house of deceased's father, to ask Henry Bush to help him do some work. He says that he stopped at deceased's house on his way some fifteen minutes, but it is unquestioned that he was just at the clump of bushes—the only hiding place on the way between the houses of deceased and his father. In the meantime deceased, having eaten supper with his parents, started home. He had been gone but a

few minutes when the firing was heard. At the first shot the father cried, "They are shooting my son," and ran out the front door. The father, mother, and Henry Bush say there were four shots fired, and in the direction of the house. They went out, and found him dead, his head towards his father's house, 100 yards off. The tracks of deceased were traced from the house almost past a clump of live oak bushes on the side of the road, where they were seen, as stated by several witnesses, to turn back suddenly, and run diagonally across the road, followed by defendant's tracks. Just where he turned, deceased's hat was found lying where it had dropped. About fifteen or twenty steps further, deceased fell on his knees, but got up again, and ran, and his body was found fifty yards up the road, face downward.

From the bushes to where the body was found, the defendant's tracks were traced with those of deceased, and it was shown that both were running; and witness Bush says, "After the first shot, I heard them running, but no hallooing." From the evidence of premeditation and preparation; the relations between defendant and deceased's wife; the fact that defendant ascertained the time of deceased's return; at the time appointed for the return the defendant was at the live oak bushes, the only place he could secrete himself on the way between the house of deceased and his father's; the tracks on the ground; the fact that it was deceased who fell on his knees, and not the defendant—apparently rendered it in the minds of the jury wholly improbable that there was any truth in defendant's explanation that he was on his way to engage Bush to help him in his work.

It seemed clear to the jury that defendant waylaid deceased with a pistol prepared for him, and deceased attempted in vain to escape. The jury evidently believed, if there was a struggle, it was not the attack of an injured husband seeking revenge for a wife's dishonor which he had meekly borne for months, but rather a dying man, mortally wounded, struggling with his assassin. They may have thought that the blood saturating the sleeves and breast of the defendant's coat, and the single blood-stain in the center of his back, caused perhaps by the grip of a bloody hand that had sought in vain to staunch the blood flow, was consistent with a struggle, but the absence of blood from the neck, shoulders, and hat of defendant was fatal to defendant's statement that deceased had borne him to the ground, and was standing behind and over him and holding him while he fired three successive shots into his body and throat. But, upon whatever theory they accounted for the blood-stains on defendant's coat, we think they were fully justified in discarding the statement of defendant, and it left the case one of deliberate assassination.

The judgment is affirmed.

*Affirmed.*

Davidson, Judge, concurs; Hurt, Presiding Judge, dissents.