### R. W. J. SMITH v. THE STATE.

No. 1602. Decided April 19, 1899.

**1. Indictment—Service of Copy of Indictment.**

A defendant, after his conviction, can not be heard to complain that the copy of the indictment served upon him was defective.

**2. Charge of Court—How Considered.**

The charge of the court must be considered as a whole, and not by isolated sentences.

**3. Murder—Threats—Charge.**

On a trial for murder, where the evidence showed that deceased was making no demonstrations at the time he was killed, and the court charged the jury that "threats made by one to kill another will not justify the latter in killing the former, unless he (the one who made the threat) was at the time of the killing making some demonstration to execute the threat. If deceased had threatened to take the life of defendant, such threats, if any, would not justify defendant in killing deceased." Held, not prejudicial.

**4. New Trial—Absence of Witness.**

The absence of a summoned witness is not ground for a new trial where no motion for continuance or postponement has been made before announcement of ready for trial, or as soon thereafter as it is ascertained that the witness is absent, where defendant has announced ready under the impression that his witness was present.

**5. Jury Law—Verdict—Time of Deliberation Upon.**

The length of time a jury may take in considering their verdict and arriving at a conclusion is not fixed by law, and there is no rule by which to determine the matter. That they return a verdict in twenty-five or thirty minutes, in a murder case, would not indicate that they had not sufficiently deliberated.

**6. Murder—Charge as to Lower Degrees.**

On a trial for murder, where the facts are positive and uncontradicted that the killing was done deliberately and sedately, the court is only required to submit the law of murder in the first degree. It is only where there is doubt as to deliberation and express malice that the law applicable to murder in the second degree should be given; and only where the facts justify or call for it, that the law of other inferior degrees of homicide should be given.

**7. New Trial—Newly Discovered Evidence.**

A new trial for newly discovered evidence to prove a defendant's insanity will not be granted where, if defendant's mind was weak or erratic, the slightest diligence could have ascertained that fact at any time before the trial; and where the affiants supporting this ground for new trial were friends, at least associates, of defendant, and knew him intimately.

**8. Murder in the First Degree—Evidence Sufficient.**

See opinion for evidence summarized which the court holds amply sufficient to support a verdict and judgment for murder in the first degree, inflicting the death penalty.

APPEAL from the District Court of Orange. Tried below before Hon. STEPHEN P. WEST.

Appeal from a conviction for murder in the first degree; penalty, death.

Appellant was charged by the indictment with the murder of· J. W. Roby, by shooting him with a gun, on the 9th day of September, 1898.

The essential facts attendant upon the killing are very concisely but sufficiently stated in the latter portion of the opinion below, and no further statement is deemed necessary.

No brief for appellant has come to the hands of the Reporter.

*Robt. A. John,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; hence this appeal.

As a ground of his motion for new trial, he urged that the copy of the indictment served upon him was defective. This matter comes too late after conviction.

The charge of the court is complained of, and an isolated sentence in regard to threats is culled by appellant as error. The charge as a whole in regard to this matter should be considered. The following is the charge given: "Threats made by one to kill another will not justify the

latter in killing the former, unless he (the one who made the threat) was at the time of the killing making some demonstration to execute the threat. If deceased had threatened to take the life of defendant, such threats, if any, would not justify defendant in killing deceased " We do not understand how this charge, under the facts of this case, injured appellant. Deceased was making no demonstration at the time he was killed,—had thrown up his hands, and was begging for his life. There was some evidence introduced to the effect that deceased had made threats against the accused.

Another ground of the motion for new trial is based on the absence of the witness Harris, who had been summoned to attend the trial. This should have been presented in a motion for continuance or postponement; and if appellant announced "ready" under the impression or belief that Harris was present, when he was not, as soon as his absence was discovered appellant should have moved to continue or postpone the case. As presented, this matter can not be urged on the motion for new trial.

The jury returned their verdict in about twenty-five or thirty minutes after their retirement. This is complained of as being an indication of a want of deliberation. The length of time a jury may take in considering their verdict and arriving at a conclusion has not been fixed by law. Of course, they are expected to deliberate calmly upon the matters and questions submitted to them upon the trial, but we are not authorized to say the time occupied by them was not sufficient. It is not even contended that such was the case. We have no rule by which we can determine the length of time a jury should occupy in deliberating upon their verdict.

Nor do we think there was error in the court's failure to charge on murder in the second degree. If the facts in this record are true,—and they seem to be undisputed,—the killing was deliberately done. In fact, it is seldom that a record shows more deliberation. We take it to be a sound rule, and one upheld by an unbroken line of decisions in this State, that it is only necessary to charge on the law applicable to the facts in evidence. Where the facts are positive and uncontroverted that the killing was done deliberately and sedately, then the law of murder in the first degree would only apply. If there should be a doubt as to whether the killing was upon deliberation and express malice, of course the law applicable to murder in the second degree should be given; and, if the facts justify or call for it, the law applicable to other inferior grades of homicide should be given. But the proposition is too well settled for discussion that the court is only required to charge on the law applicable to the evidence in the case.

Nor do we think there is any merit in the motion with reference to newly discovered testimony. If appellant's mind was weak or erratic, the slightest diligence could have ascertained this fact at any time before the trial. The homicide and trial occurred in the same town. Appellant had been living there for some time. The witnesses whose affidavits were attached to the motion for new trial seem to have been his friends,—at

least, his associates,—and knew him intimately; and it did not occur to
any of them, nor even to his attorney, nor to any of the parties connected
with this record, officially or otherwise, that appellant's mind was wrong.
And it seems that the main facts upon which this weakness of mind was
predicated were that at times he was absent-minded, and would sometimes
rapidly or suddenly change the subject of conversation.   McPhail was
a witness upon the trial of the case, and his affidavit, attached to · the
motion for new trial, is to the effect that he had known appellant about
two and a half years, and he had boarded at affiant's house.   At times he
thought appellant acted strangely.   He would get up ideas like wild-cat
schemes,—that is, he would get some kind of a sleight of hand show, out
of which to make money,—and once he tried to get witness to go in with
him.   This seems to have been in regard to an investment in some char-
acter of X-ray machine.   He states that appellant thought himself in-
competent to make speeches explanatory of the X-ray exhibitions, and
wanted Captain McPhail to take charge of this part of the matter and
deliver lectures on the stage during the exhibitions.   Appellant also
spoke of going into the poultry business, sometimes in California, and
sometimes where he was then residing,—at Orange.   He upon one occa-
sion stated that he was not well, and had come to the conclusion that he
was a fool, because he only had sense enough to work, and let other people
spend his money.   We fail to see any evidence of insanity in these mat-
ters, or at least sufficient evidence to justify the reversal of this judgment.
It would hardly be correct to hold that a party who entertains wild-cat
ideas and doubtful money schemes is insane, and certainly it is not evi-
dence of insanity that one desires to go into the poultry business either
in California or at Orange.   Perhaps we are justified in saying that, as
a matter of current history, some of the most learned and wisest scien-
tists of the world have invested in X-ray speculations, as well as in the in-
vestigation of science along that line.   We hardly think this is an evi-
dence of their insanity.   Nor do we think it necessarily an evidence of
insanity that one man kills another under atrocious circumstances.   The
law makes such a killing murder upon express malice, and to hold such
killing evidence of insanity, in and of itself, would be to destroy the law
of murder.   That atrocious circumstances, taken in connection with
other facts, may tend to show insanity, might be conceded; but that
would depend upon the other environments of the transaction.   The
court did not err in refusing a new trial upon this ground.

Nor did the court err in refusing to set aside the verdict because of a
want of sufficient evidence to support the judgment.   Appellant and de-
ceased were at enmity.   Evidence was adduced to show that deceased had
threatened to kill appellant, or do him injury.   It was proved beyond
contradiction that appellant had threatened to kill deceased, because he
claimed deceased had swindled him or stolen his money.   He had prose-
cuted deceased a time or two on account of these matters.   Upon the trials
deceased had been discharged by the court, and appellant threatened to
kill him; and at the very time he did kill him it was about these money

transactions.   Deceased was passing along the road.   Defendant came
out of the boathouse where he seems to have been residing, with a double-
barrreled shotgun in both hands, spoke to deceased, saying, "Roby, what
did you do with that money which you went to Lake Charles on?" and
threw his gun down on deceased.   Deceased threw up his hands, and
said, "Please, Joe, don't kill me."   Defendant made no reply, but shot
deceased twice with the shotgun, and turned and went into his boathouse,
got his pistol, and "covered" deceased with it.   When the witness Collups
reached appellant, immediately after the shooting, he remarked to him
in regard to the deceased:  "Damn him!  I guess he won't steal any
more money from me."   Defendant held the pistol on the body of the
deceased until he was satisfied of death, and assigned as a reason that
he saw "deceased kicking," and did not know whether he would get up
or not.

We have examined the record carefully, and find no reversible error in
the same.   The judgment is accordingly affirmed.

*Affirmed.*